A jury found defendant Michael White guilty of kidnapping and seven counts of rape. In this appeal, he complains the court erred by (1) sentencing him to the maximum term, (2) entering a guilty verdict when the evidence failed to support a finding of guilt on some of the rape counts, (3) failing to merge the kidnapping count with the rape counts, and (4) ineffective assistance of counsel.
The victim testified that she had been attending a New Year's Eve party with her brother and the brother's girlfriend. The three left the party in the early morning hours. The brother decided to spend the night with his girlfriend, so the victim decided to take a bus home. While walking to the bus stop near the Case Western Reserve University campus, a red sport utility vehicle driven by defendant pulled alongside the victim. Defendant asked if she needed a ride. The victim refused and continued to the bus stop. While at the bus stop, she saw defendant ride by several times. The victim became anxious so she went to a pay phone and paged her brother using a special code that indicated an emergency. The brother called back immediately and the victim told him that a man had been following her. They agreed they would meet halfway to the girlfriend's apartment.
As the victim walked to meet her brother, defendant grabbed the victim, told her he had a gun and would kill her if she did not obey him. He dragged the victim across the university campus and down a stairwell. He attempted to rape her from behind, but the victim said he could not penetrate her so "tried to put his fingers around that area." While this occurred, the victim saw a car pass by and screamed for help. Defendant told the victim he would kill her if she called out again.
Frustrated with his inability to penetrate the victim, defendant demanded she perform oral sex. Defendant entered the victim's mouth, but she refused to fellate him. He then spun her around and again attempted to enter her from behind. Defendant continued to have difficulty, although the victim said she could feel him against the opening of her vagina. Defendant also digitally penetrated her. He then forced her to perform oral sex until he climaxed.
Despite freezing temperatures and three inches of fresh snow, defendant took the victim's coat and left her face down in the stairwell, telling her he knew where she lived and would kill her if she told anyone about the rape. The victim saw snow plows plowing a nearby parking lot. She flagged down one of the plows and told the driver she had just been raped. As she sat in the cab of the snow plow, she saw defendant's vehicle parked nearby. Another snow plow driver took down the license number.
The police traced the license number to defendant. They arrived at his house the following day, and observed him trying to flee from a side door of his house when they knocked on the door. Defendant told the police he did not remember what happended that evening because he had been drunk and over at his cousin's house. When asked to identify his cousin by name and address, defendant remained silent. The victim later identified defendant from a lineup. Subsequent DNA testing of semen found on the victim confirmed that it came from defendant. Photographs taken the day after the rape showed numerous bruises on the victim's knees, thighs, arms and neck.
Defendant testified and said that he and his cousin had been drinking earlier on the day in question, but that he was not drunk during the evening. He said that he attended a New Year's Eve party until about midnight before leaving to travel to another bar. Finding that bar too crowded, defendant had been driving home when he saw the victim walking. She waved to him and he pulled over. The victim told defendant she was drunk and needed a ride home. She entered the truck and asked defendant if he had any drugs. Defendant replied in the negative, but told her he had some money because "I don't know if she was propositioning or not, but I just said I had money because that's what usually happens." He then pulled the truck over and said the victim performed oral sex. She then exited the truck, falling as she did so.
The jury found defendant guilty of rape and kidnapping, and acquitted him of aggravated robbery charges relating to the theft of her coat. The court sentenced defendant to maximum terms of ten years actual time on each count, ordering counts 1 and 2 to be served consecutively, and both counts served concurrent with count 3. The court further ordered defendant to serve counts 4 through 8 consecutively for a total confinement time of seventy years actual time.
 I
The first assignment of error complains the court erred by imposing the maximum ten-year sentence for rape and kidnapping without first considering whether the minimum sentence was appropriate and without making requisite findings to justify the maximum sentence.
The overriding purposes of Ohio's new felony sentencing scheme are to "* * * protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.11(A). Unless a mandatory prison term is required, a court that imposes a sentence upon an offender for a felony has discretion within statutory limits to determine that most effective way to comply with the purposes and principles of sentencing set forth in R.C.2929.11. See R.C. 2929.12(A). As a starting point, an offender who has not previously served a prison term must be sentenced to the minimum prison term provided unless the court finds the shortest allowable term would either demean the seriousness of the offense or would not adequately protect the public from future crime by the defendant or others. R.C. 2929.14(B). The ending point, a maximum sentence, may be imposed upon a finding the offender committed the worst form of the offense or poses the greatest likelihood of recidivism. R.C. 2929.14(B).
To impose the maximum sentence, there must be a finding on the record that the offender posed the greatest likelihood of recidivism or committed the worst form of the offense. See Statev. Banks (Nov. 20, 1997), Cuyahoga App. No. 72121, unreported;State v. Beasley (June 11, 1998), Cuyahoga App. No. 72853, unreported. We do not require the court to utter any "magic" or "talismanic" words, but it must be clear from the record that the court made the required findings. See State v. Stribling
(Dec. 10, 1998), Cuyahoga App. No. 74715, unreported.
 A
R.C. 2929.14(B) requires the court to impose the minimum sentence upon an offender who has not previously served prison time "unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.
In this case, it appears that defendant had not previously served a prison term. Accordingly, the court had the duty to consider whether a minimum prison term must be imposed. In its sentencing entry, the court stated, "consecutive sentences are appropriate and necessary to protect the public and not demean the seriousness of the conduct and its effect upon the victim." This language is consistent with that contained in R.C.2929.14(B), and we cannot find by clear and convincing evidence that the record fails to support the court's findings. See R.C.2953.08(G)(1)(a).
 B
The next issue is whether the record adequately justifies the court's decision to impose the maximum sentence. When discussing the case during sentencing, the court stated:
 And this Court holds that there is separateness in this case. This victim was at a bus stop at the base of Cedar Hill and she was literally chased out of that area. She was eventually captured and then she was taken by force and violence from one part of the Case Western Reserve University campus to another part of the campus where unspeakable crimes were committed upon her.
 This event was her worse [sic] nightmare and for those in public transportation in and through urban college campuses a fear of this event is uppermost. In this case the victim was plucked from the bus station even though there were two other individuals present, obviously fearing for their lives.
In order to impose a maximum sentence, the court had to find either that defendant committed the worst form of the offense or posed the greatest likelihood of recidivism. The record supports a finding that the court believed defendant committed the worst form of the offense, for its remarks suggested defendant committed "unspeakable crimes" which were the victim's "worst nightmare." The record shows defendant stalked the victim at a public bus stop, threatened her and abducted her. He continually forced himself upon her, refusing to abandon his crimes when it became apparent that he could not complete intercourse. In the process he humiliated and debased the victim. When he completed his crimes, he took the victim's coat and abandoned her on a freezing night.
It may be no comfort to the victims of crimes to hear the courts say that one form of an offense is worse than others, but a judicial determination that an offender committed the "worst form of the offense" is not meant to diminish the impact on all victims who suffer the indignity of crime. This judicial weighing of the relative impact of crimes evinces a legislative determination that some offenders deserve more punishment under certain circumstances than others. The impact of crime may be widely felt, and the courts would be remiss if they were to ignore, when judging the severity of the form of the offense, the impact the crime has on a victim. The victim in this case gave a compelling and humbling statement of how defendant's crimes affected her and her family. In response, defendant accused the victim of lying and told the court he would serve his sentence as a sacrifice to all those falsely accused of crimes. The court concluded that the offense had been a nightmare for the victim. Given the manner in which defendant committed the offenses, the impact to the victim and defendant's lack of remorse, we cannot find by clear and convincing evidence that the court abused its discretion by sentencing defendant to the maximum term of incarceration. The first assignment of error is overruled.
 II
In his second assignment of error, defendant complains the jury lacked sufficient evidence to find him guilty of seven different counts of rape. He argues the victim admitted that defendant failed to make penetration while attempting to engage in intercourse, and that one of the counts relating to digital penetration was likewise unsupported by the evidence. He therefore concludes the evidence only supported five, not seven, counts of rape.
When reviewing a claim relating to the sufficiency of the evidence supporting a criminal conviction, we view the evidence most favorably to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. See State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus; Statev. Thompkins (1991), 78 Ohio St.3d 380, 390-391 (Cook, J., concurring).
R.C. 2907.02(A)(2) prohibits any person from engaging in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. R.C.2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however, slight, is sufficient to complete vaginal or anal intercourse."
The evidence, taken in a light most favorable to the state, showed defendant completed two distinct acts of oral sex (a first time when he forced himself in the victim's mouth; a second when he ejaculated), made digital pentration "three or four times," and made penile penetration once. Contrary to defendant's argument, the victim testified that when defendant tried to reenter her she actually felt him "in the opening of my vagina." See Tr. 289. These add up to seven distinct acts of rape, the exact number charged by the indictment.
Defendant also claims the victim's testimony that defendant completed "three or four" acts of digital penetration is too speculative to establish a basis for guilty verdicts on four acts. In State v. Vines (Sept. 14, 1989), Cuyahoga App. No. 55693, unreported, we considered an identical argument where Vines had complained that and stated, "[t] he victim's inability to denote the exact number of times Vines performed these actions goes to the weight of the evidence not the sufficiency. See Statev. Harris (June 3, 1982), Cuyahoga App. No. 44154, unreported;State v. Richardson (May 6, 1982), Cuyahoga App. No. 44081, unreported."
Our recent decision in State v. Langston (Feb. 12, 1998), Cuyahoga App. No. 71578, unreported, is not to the contrary. InLangston, the child victim of ten charged counts of rape could do no better than testify that he had been raped "a number of times" and that "it happened more than once." We conceded these statements would be sufficient to support only two counts of rape, but by referencing three different time periods in which the victim had been in Langston's company, we concluded the evidence could support three guilty verdicts.
In this case, the victim's testimony that defendant digitally penetrated her "three or four" times was sufficient evidence that those acts could have occurred four, rather than three times. Unlike Langston, where the child-victim could only say the rapes occurred "more than once," the victim's testimony in this case was sufficient to permit the jury to decide the precise number of times the rapes occurred. The second assignment of error is overruled.
 III
Defendant's third assignment of error complains the court erred by refusing to find the kidnapping charge an allied offense to the rape charges. He argues the kidnapping and rapes were allied offenses committed with similar import. The court refused to merge the offenses, finding a "separateness" between the kidnapping and the rape because defendant "captured" the victim and took her by force and violence from one part of the campus to another part of the campus.
Kidnapping and rape can be allied offenses of similar import and an offender may only be punished for both offenses if they are committed separately or with a separate animus as to each within the meaning of R.C. 2941.25(B). See State v. Price (1979),60 Ohio St.2d 136, paragraph five of the syllabus, approving and following State v. Donald (1979), 57 Ohio St.2d 73.
In the syllabus to State v. Logan (1979), 60 Ohio St.2d 126, the Ohio Supreme Court established guidelines to determine whether kidnapping and another offense are of the same or similar kind, and committed with a separate animus as follows:
 (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
 (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
The court correctly noted that defendant's restraint of the victim was so substantial both in terms of length and substance that it demonstrated a separate animus. The victim said defendant essentially stalked her, continually driving by her as she waited for a bus. While she attempted to find a safe place, defendant grabbed her, threatened to kill her and "started dragging me across campus * * *." He took her around the back of one of the buildings and tried to throw her down a flight of stairs.
In State v. Alexander (Feb. 25, 1993), Cuyahoga App. No. 61674, unreported, we considered a very similar fact pattern. Alexander grabbed his victim, threatened to kill her and dragged her until she was confined in the corner of an enclosed court yard before raping her. Citing to State v. Moore (1983), 13 Ohio App.3d 226, we found Alexander's act of dragging the victim from an open place to a concealed place for cover during the rape constituted a separate animus for kidnapping and rape. See, also, State v.Thomas (Aug. 5, 1986), Franklin App. No. 85AP-414, unreported (kidnapping victim from hallway and forcing her to walk to a locked restroom and performing rape in restroom stall constituted greater asportation than that required for rape).
The court did not err by finding defendant's stalking, which ended with him dragging the victim across campus to a secluded stairwell, contained a separate animus from the rape offense. The third assignment of error is overruled.
 IV
The fourth assignment of error complains that defendant received ineffective assistance of trial counsel because counsel failed to do a litany of things at trial.
To establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that trial counsel's performance fell below the objective standard of reasonable competence under the circumstances. Second, a defendant must show that, as a result of this deficiency, he was prejudiced at trial. Stricklandv. Washington (1984), 466 U.S. 668, 687; State v. Mills (1992),62 Ohio St.3d 357, 370. Even if counsel's performance could be deemed deficient for Sixth Amendment purposes, it must still be shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. Id.; State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
We have considered each of the seven claimed instances of ineffective assistance of counsel and find only three merit any discussion.
First, defendant claims counsel should have asked the court to conduct an in camera hearing into the victim's past sexual history.
Defendant's argument shows a fundamental misunderstanding of the Rape Shield Law. R.C. 2907.02(D) states:
 Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
In State v. Gardner (1979), 59 Ohio St.2d 14, 17-18, the Supreme Court stated:
 Several legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.
Exceptions to the prohibition include evidence of the origin of semen, pregnancy, disease, or evidence of the victim's past sexual activity with the defendant. See R.C. 2907.02(D). Defendant did not challenge the origin of the semen; in fact, he admitted it was his. Nor did he claim a past sexual history with the victim. Lacking these two bases for submitting evidence of the victim's past sexual history, any request by counsel for a rape shield hearing would have been denied.
Second, defendant claims counsel should have cross-examined the victim and her brother about her possible drug use in order to attack their credibility. Any questions about the brother's drug use would have been irrelevant, for there was no testimony about any possible drug use by him and no question concerning his cognitive abilities during on the night of the offense. Given his minimal role, it remains obscure to us just what defendant hoped to prove by showing the brother's possible drug use on the night of the offenses.
There would have been marginal relevance to asking the victim if she used drugs since defendant maintained she claimed to have said she was high, but counsel's decision to ask the question might have backfired, a point defendant concedes in his supplemental brief. If, as defendant appears to concede, such a question might have created a backlash of sympathy for the victim, we fail to see how this matter of trial strategy can be the basis for an ineffective assistance of counsel claim. SeeState v. Carter (1995), 72 Ohio St.3d 545, 558.
Third, defendant complains that counsel failed to call character witnesses or fact witnesses in his defense. This argument really centers on counsel's failure to call defendant's cousin. It may be remembered that defendant initially told the police he had been drinking with his cousin and could not remember what happened because he had been drunk. When asked by the police to identify his cousin by name and address, defendant remained silent. At trial, defendant's story changed signficantly. He admitted having sex with the victim, but claimed it had been consensual. He also denied being drunk at the time of the offense, claiming he and his cousin split a pint of alcohol earlier in the day, but he had nothing else to drink from 10:00 a.m. that morning until the time he encountered the victim. Moreover, defendant testified that at the time he met the victim he had been driving to a bar looking for a New Year's Eve party.
Just what defendant's cousin would have added to the story escapes us, for defendant admitted engaging in sexual conduct with the victim and the DNA evidence confirmed this fact. It would have been a dubious defense strategy for defendant to deny committing the offenses by saying he had been home drinking with his cousin at the time, when the state had conclusive physical proof to the contrary.
As a final matter, defendant cannot seriously argue counsel performed deficiently because he failed to put on character witnesses to vouch for him. Defendant was caught trying to flee his house when approached by the police, and he lied to them by saying he had been with his cousin the previous evening. He admitted drinking on the day in question, although he later told the jury "I don't drink or smoke." He claimed that being a husband and father of three should have counted for something, yet he admitted to the jury that the victim might have been propositioning him for sex and "I said I had money because that's what usually happens." Defendant was no Ozzie Nelson. Counsel did not perform deficiently by recognizing this fact. The fourth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, J., CONCURS. See Concurring Opinion, Michael J. Corrigan, J., attached hereto.
DIANE KARPINSKI, P.J., CONCURS AND DISSENTS. See Concurring and Dissenting Opinion, Diane Karpinski, P.J. attached hereto.
 ________________________________ JOHN T. PATTON JUDGE